UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,                Case No. 18-20533
v.                                  District Judge Victoria A. Roberts

MICHAEL HINDS,

    Defendant.
_____/

## ORDER GRANTING DEFENDANT'S MOTION TO SUPPRESS [ECF No. 54]

In November 2017, Michael Hinds and two others sat parked in a minivan when two Detroit police officers approached. In response to questioning, one of the occupants admitted there was marijuana in the van. What began as a *Terry* stop soon transformed into a custodial detention. Despite this, the officers did not give any *Miranda* warnings. Hinds made a statement regarded as a confession.

Hinds is charged with: (1) one count of possession with intent to distribute a controlled substance in violation of 21 U.S.C. § 841; (2) felon in possession of a firearm in violation of 18 U.S.C. § 922(g); and (3) possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. 924(c) Before the Court is Hinds' motion to suppress. [ECF No. 54]. He asks

1

the Court to suppress one statement. The Court held an evidentiary hearing on May 10, 2021.

For the reasons set forth below, the Court **GRANTS** Hinds' motion to suppress.

I.  BACKGROUND

Around midnight on November 23, 2017, Detroit Police officers Daniel Harnphanich ("Harnphanich") and Christopher Bush ("Bush") patrolled what they called a "high crime area" that they typically drive through two to three times a night. They observed three individuals in a smoke-filled minivan parked in front of a vacant house. The officers believed the occupants were smoking marijuana. They pulled their scout car alongside the van and Harnphanich asked if its occupants were smoking. He also asked them whether they had any "mags" or "burners," both street terms for firearms, and if it would be okay for him to check for "mags." Harnphanich testified Hinds immediately became defensive.

Harnphanich exited the scout car and approached the van. He saw plastic vials and Hinds rolling loose marijuana in smoking paper. Harnphanich asked if it was "just weed." Hinds replied that he had a marijuana card. Harnphanich asked again whether there were "burners" in

the van. Hinds said there was nothing in the van and asked why the officers wanted to search it. Harnphanich told Hinds that he could search the van because Hinds was not transporting the marijuana properly.

Harnphanich says Hinds acted suspicious, so he told Hinds to place the marijuana on the dash and step out to Bush. Bush opened the passenger door while Hinds attempted to reach in his pocket — he says to get his marijuana card. Harnphanich told Hinds to stop and told Hinds to step out again. He asked Hinds if he had a pistol. Harnphanich said, "You're making me think you got a pistol, man." Hinds said he did not have a pistol. He did get out of the van for Bush to search him while Harnphanich opened the driver's door and searched the driver. After the officers completed the searches, Harnphanich walked the driver to the squad car and told Bush to cuff Hinds and the driver together because Hinds was, "acting up." There is no evidence of this on the bodycam.

The driver asked, "We're not under arrest, we're being detained right?" While the government says the officers told the occupants they were not under arrest, the bodycam footage does not capture this.

Harnphanich returned to the van and asked the third occupant to step out. He then searched the van. He found a bag underneath Hinds' seat,

opened it, and looked at the contents. Harnphanich walked away from the van and said, "King David on the passenger." Harnphanich asked Hinds if he had a "heroin card" or "a crack card." Harnphanich returned to the van, placed the bag on the seat, and searched it again. He walked back to the scout car with the bag in hand and said, "Beautiful, and a Eureka."

Harnphanich stood at the scout car. The occupants stood in front of the car and watched Harnphanich as he took a gun out of the bag and placed it on the hood. One of the occupants asked, "What's a Eureka?" Harnphanich explained that "Eureka" is a pistol and asked if they had a pistol license. Harnphanich continued removing the bag's contents and placing things on the hood. The bag also contained crack cocaine, heroin, and a small digital scale. Harnphanich asked the driver if there was, "anything else in the car that [he] should know about?" Before the driver answered, Hinds interjected, "No, he don't" "It's all me, bro." and asked to see a lawyer. Despite listening to the bodycam footage numerous times, both before and during the hearing, the statement "It's all me, bro" is not clearly heard by the Court.

Harnphanich testified that within three to five minutes after Hinds made the statement, they uncuffed him from the driver, cuffed his hands behind his back, and placed him in the scout car. Harnphanich says within ten minutes, his supervisor and two other officers arrived on the scene. He says that he

4

did not *Mirandize* Hinds because the Detroit Police Department's policy is that the arresting officer does not give *Miranda* warnings. Instead, the arresting officer typically waits for an investigator to arrive to do this. Harnphanich estimates Hinds was mirandized "probably 15 minutes" after the officers placed him in the scout car.

II. ANALYSIS

Hinds says the Court should suppress the statement "It's all me, bro" because he was not *Mirandized* when he said it in response to questioning. The government argues Hinds was merely detained during a "routine traffic encounter," which did not trigger *Miranda* protections because such encounters are more akin to *Terry* stops.

The Court must decide: (1) whether Hinds was in custody when he made the challenged statement and (2) whether the statement was the product of Harnphanich's interrogation.

**A. The Detention Exceeded the Typical Traffic Stop**

The government says Hinds was not entitled to *Miranda* protection because the officers only conducted a *Terry*-style traffic stop.

Individuals temporarily detained pursuant to "ordinary" traffic stops are not "in custody" for purposes of *Miranda* because ordinary traffic stops are

5

inherently less coercive than custodial interrogations. *Berkemer v. McCarty*, 468 U.S. 420 (1984). But, the *Berkemer* Court held, "[i]f a motorist who has been detained pursuant to a traffic stop thereafter is subjected to treatment that renders him 'in custody' for practical purposes, he will be entitled to the full panoply of protections prescribed by *Miranda*." *Id*. at 440.

The prominent, defining features of a typical traffic stop are: (1) it is "presumptively temporary and brief," and (2) "circumstances associated with it are not such that the motorist feels completely at the mercy of the police". *Id*. at 437-38. Because the typical traffic stop is "substantially less 'police dominated' than that surrounding the kinds of interrogation at issue in *Miranda* it is more akin to a *Terry* stop." *Id*. at 439. What constitutes "in custody," even in the context of a *Terry*-type traffic stop, must be determined "on a case-by-case basis." *United States v. Schultz*, 442 F.Supp. 176, 181 (D.Md. 1977).

The first *Berkemer* factor — that the stop was presumptively temporary and brief — weighs in the government's favor. Harnphanich's bodycam footage confirms that.

But, the second *Berkemer* factor — whether the motorist felt completely at the mercy of the police — weighs heavily in Hinds favor. The

government contends that since the questioning took place outside in a public space, and the officers told Hinds and the other occupants of the van that they were not under arrest, this was merely a *Terry* traffic stop.

Stops in public places must be carefully scrutinized in the context of the totality of the circumstances. *Id*. Hinds detention occurred on a public street in Detroit. Although a public area may not imply custody, multiple officers and vehicles can "transform [ ] that benign public place into a restrictive area of confinement, which also tips the scales in favor of Defendant." *United States v. Jimenez-Robles*, 98 F.Supp.3d 906, 917 (E.D. Mich. 2015).

The Court also considers the restraint on Hinds' freedom. *See United States v. Swanson*, 341 F.3d 524, 530 (6th Cir. 2003). Although the officers testified that the occupants were not under arrest when Hinds gave the so-called confession, they admitted that Hinds and company were not free to leave while Harnphanich searched the van. Moreover, the officers handcuffed Hinds and the driver together. This obvious restraint on Hinds' freedom weighs in favor of the Court finding he was in custody. *Id*.

From the beginning of the encounter, the officers asked the occupants repeatedly about weapons and drugs. Officers are permitted to ask

questions about weapons that are specifically related to the "legitimate and weighty" consideration of officer safety. *Pennsylvania v. Mimms*, 434 U.S. 106, 110 (1977). Although Hinds answered that there was not a gun inside the van, Harnphanich recovered one during his search. Harnphanich continued to question Hinds about the gun after Hinds and the driver were cuffed together and there was no longer a concern for officer safety. Continuing to question Hinds after the officers already had evidence of an arrestable federal offense weighs against the government's argument that this questioning was part of a typical traffic stop.

If this were an "ordinary" traffic stop, the officers would have verified the occupants' identity, issued them a citation for the misdemeanor crime of improperly transporting marijuana, and allowed them to leave. *See Jimenez-Robles*, 98 F.Supp.3d at 916. But, the officers continued the occupants' detention. As the Supreme Court expressed in *Berkemer*, if an individual detained during a traffic stop is thereafter subjected to treatment that renders him in custody for practical purposes, he is entitled to the full panoply of protections prescribed by *Miranda*. 468 U.S. at 440.

This encounter began as a typical traffic stop. The officers saw smoke and the occupants admitted they had marijuana. A *Terry* stop is appropriate when officers see a smoke-filled vehicle and the occupants admit to the

possession or use of marijuana. *See United States v. Thomas*, 2019 WL 5677503 at *2 (N.D. Ohio Nov 1, 2019) (The search of a vehicle was appropriate after an officer initiated a traffic stop, saw smoke billowing out of the driver side door as he approached, noticed the plain smell of smoke, the passenger displayed a partially smoked blunt, and the driver admitted that he smoked marijuana). The officers continued to question Hinds about contraband in the van without *Mirandizing* him although they had knowledge that there were already grounds for an arrestable offense. After the officers found the gun, the dynamics of the encounter changed and transformed into a custodial detention.

The Court finds Hinds' detention exceeded the typical traffic stop described in *Berkemer*. This quickly became a police dominated encounter. The Court now turns to whether the officers subjected Hinds to a custodial interrogation.

### B. Hinds Was in Custody

While the detention exceeded the typical traffic stop, the question is whether Hinds was in custody for *Miranda* purposes. Whether a person is "in custody" is a mixed question of fact and law. *Jimenez-Robles*, 98 F.Supp.3d at 913. (citing *Swanson*, 341 F.3d at 528). The answer turns on "whether there has been either a 'formal arrest' or a restraint on freedom of movement

of the degree associated with a formal arrest.'" *Id*. The Court must consider the totality of the circumstances. *Id*. In *Swanson*, the Sixth Circuit discussed the factors a court should consider in deciding whether a person is in custody:

> (1) Whether a reasonable person in the defendant's position would feel free to leave; (2) the purpose of the questioning; (3) whether the place of the questioning was hostile or coercive; (4) the length of the questioning; and (5) other indicia of custody such as whether the suspect was informed at the time that the questioning was voluntary or that the suspect was free to leave or to request officers to do so; whether the suspect possessed unrestrained freedom of movement during questioning; and whether the suspect initiated contact with the police … [or] acquiesced to their requests to answer some questions.

Swanson 341 F.3d at 529. The Court evaluates the *Swanson* factors as they relate to Hinds.

### 1. Whether a reasonable person would feel free to leave

The officers testified that the occupants were not free to leave. Bush testified that had they attempted to leave, he and Harnphanich would have gone after them. The officers also cuffed Hinds and the driver together, restraining their movement and making it more difficult to leave. *Swanson* recognized that "in the context of a *Terry*-style investigatory detention, a

person is not free to leave, at least temporarily." *Id*. This factor weighs in favor of a conclusion that Hinds' detention was a custodial interrogation.

## 2. Purpose of questioning

The government says the purpose of the questioning was to ask the driver about the unsearched portion of the van. The statement Hinds seeks to suppress was elicited right after Harnphanich recovered the contraband from the van, reported a "King David" and a "Eureka," sarcastically asked Hinds whether he had a "heroine card," "crack card," or "pistol license," and had placed the contraband on the hood of the scout car as the occupants looked on.

At the evidentiary hearing Harnphanich testified he asked the driver if there was, "anything else in the car that [he] should know about." Harnphanich says Hinds answered for the driver, "No, he don't." Harnphanich then asked Hinds, "So, is this all you?" Hinds responded, "It's all me, bro."

The Court asked Harnphanich if the question, "So, is this all you?" one that would elicit incriminating information. Harnphanich answered,

> "When I asked, 'is this all you,' [Hinds] was answering for Mr. Sinegal [the driver], [that the gun] wasn't his. So I was trying to ascertain, if this is not [Mr. Sinegal's], is this all you? So I did ask him in the form of a question and it would be incriminating, yes."

11

Harnphanich also testified, "when the investigation came to the point where [he] saw the guns and drugs … somebody was going to be arrested and it was mostly in [his] mind Mr. Hinds." After they recovered the gun, the officers knew they were investigating an arrestable felony crime and continued to ask potentially incriminating questions.

The purpose of the questioning that elicited the challenged statement was not permissible under *Swanson*. This factor weights in Hinds' favor.

### 3. Place of questioning

The third factor is whether the place of questioning was hostile or coercive. The Court discussed this factor as it analyzed whether this was a typical traffic stop. The place of Hinds' detention is distinguishable from that in *Swanson*, where the questioning happened in the presence of a team of federal agents and with seven or eight other members of the public in proximity. *Id.* at 529.

Although the questioning happened on a public street, this factor weighs in favor of *Hinds*. The two officers questioned Hinds on a dark street with vacant houses, in a "high crime area," and the officers did not turn on the lights on their scout car. They cuffed him. None of these conditions were present in *Swanson*. In that case, the defendant was explicitly told he was

12

not under arrest and was free not to speak if he chose not to do so. *Id*. at 530. The bodycam footage does not show the officers telling the occupants they were not under arrest or that they were not required to speak to the officers.

### 4. Length of questioning

The bodycam footage shows that the officers questioned Hinds for at least four minutes. The video concluded after that, but Harnphanich testified the officers placed Hinds in the back of the scout car about three to five minutes after he made the challenged statement. The officers believed Hinds was under arrest at that point and waited for additional officers to arrive and give *Miranda* warnings. Although the Court cannot confirm the exact length of the questioning, this was not a prolonged encounter. This factor weighs in favor of the government.

### 5. Other indicia of questioning

The Court also evaluates other indicia of questioning. Other indicia includes whether Hinds acquiesced to requests to answer questions. The Court acknowledges Hinds answered some questions such as whether he had marijuana, who the van belonged to, and whether he had a pistol. These factors weigh in the government's favor.

An additional consideration is whether Hinds possessed unrestrained freedom of movement during the questioning. He did not. Hinds and the driver were almost immediately cuffed together until the officers removed the cuffs from the driver and handcuffed Hinds by himself. At the end of the encounter, Harnphanich says he placed Hinds under formal arrest. Hinds did not have unrestrained freedom of movement during this encounter.

Possibly most important under the analysis is whether the officers informed Hinds at the time of questioning that he was free to leave. *Id*. The Court heard the driver ask the officers whether the occupants were under arrest or just being detained, but after reviewing the video multiple times the Court did not hear a response. The officers say they told the occupants that they were not under arrest. Still, even if the officers explicitly told Hinds he was not under arrest, they testified Hinds was not free to leave as soon as they approached the car and saw him rolling loose marijuana.

The facts demonstrate Hinds was not free to leave when he made the incriminating statement.

Based on the *Swanson* factors, the totality of the circumstances weighs in favor of the Court finding Hinds was in custody.

### C. The Police Subjected Hinds to the Functional Equivalent of a Custodial Interrogation

The government argues Hinds was not interrogated because he interjected himself into a question about the contents of the van directed to the driver.

The Fifth Amendment of the United States Constitution provides that "no person … shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. To ensure this right, the Supreme Court held in *Miranda v. Arizona*, 384 U.S. 436 (1966) that a suspect subjected to a custodial interrogation must first have notice of his right against self-incrimination. Statements elicited during a custodial interrogation from a suspect not advised of his *Miranda* protections generally may not be admitted into evidence. *Stansbury v. California*, 511 U.S. 318, 322 (1994).

Once a person is in custody, the Supreme Court held *Miranda* safeguards apply whenever that person is subjected to either "express questioning or its functional equivalent." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980). The "functional equivalent" to "express questioning" are words or actions that officers "should know are reasonably likely to elicit an incriminating response." *Id.* Simply put, the definition of "interrogation" extends "to words or actions on the part of … police officers that they *should*

*have known* were reasonably likely to elicit an incrimination response." *Id*. at 302.

Harnphanich admitted when he asked Hinds, "So, is this all you?" in an effort to understand whether the contraband belonged to Hinds, that he "did ask [Hinds] in the form of a question and it [was] incriminating." The officers say that they were continuing their investigation. They were free to continue their investigation, but not without giving the proper *Miranda* warnings. The officers subjected Hinds to the functional equivalent of express questioning.

### III. CONCLUSION

By the time Harnphanich asked "So, is this all you," the *Swanson* factors were satisfied. Considering the totality of the circumstances, the Court concludes that Hinds was in custody and subject to the functional equivalent of express questioning, to which he answered "It's all me, bro." Hinds was entitled to *Miranda* warnings at that juncture.

The Court **GRANTS** Hinds' motion to suppress. The statement "It's all me, bro" is suppressed.

**ORDERED.**

                                                    s/ Victoria A. Roberts
                                                  Victoria A. Roberts
                                                  United States District Judge

Dated: May 20, 2021