UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

               Plaintiff,                    Case Number 18-20533

v.                                      Honorable David M. Lawson

MICHAEL HINDS,

               Defendant.

_____/

**<u>OPINION AND ORDER GRANTING DEFENDANT'S</u>**
**<u>MOTION FOR INDICATIVE RULING AND DENYING MOTION FOR NEW TRIAL</u>**

     Defendant Michael Hinds was convicted by a jury of drug and firearm offenses and sentenced by the Honorable Victoria Roberts to 240 months in prison. His appeal of his conviction and sentence is now pending in the Sixth Circuit. Hinds's appellate counsel has learned that one of the police officers involved in the investigation, Christopher Bush, had been recommended for termination because of misconduct in an unrelated case. The government did not disclose that information before trial; instead, it removed Bush from its witness list. Hinds contends that he is entitled to a new trial based on a violation of the rule in *Brady v. Maryland*, 373 U.S. 83 (1963). He asked and obtained permission from the court of appeals to stay his appeal and to file a motion for a ruling under Federal Rule of Criminal Procedure 37 indicating whether this Court would grant a new trial if the case were remanded. The motion is fully briefed and argued. The Court will grant the motion and issue an indicative ruling. Based on the present record, the government's failure to disclose the arresting officer's disciplinary record, although ethically questionable, does not rise to the level of materiality necessary to establish a *Brady* violation, particularly because the officer did not testify at the trial itself, the suppressed evidence does not undermine confidence in

the verdict, and the remaining evidence supports the defendant's conviction.  Therefore, the Court would not grant the defendant a new trial.

### I.  Facts and Proceedings

### A.  The Arrest

A federal jury convicted defendant Hinds of possession with intent to distribute cocaine base, possession of a firearm as a felon, and possession of a firearm in furtherance of a drug trafficking crime.  The trial evidence revealed that the case began a little before midnight on November 23, 2017, when Detroit police officers Daniel Harnphanich and Christopher Bush encountered Michael Hinds in the passenger seat of a minivan parked in front of a vacant house. Trial Tr. Vol. II, ECF No. 167, PageID.1418, 1422-23.  Observing that the car appeared full of smoke and suspecting marijuana use, the officers asked Hinds and the two other occupants of the vehicle whether they had any "mags" (a slang term for guns).  *Id.* at PageID.1418.  The vehicle occupants said that they did not.  *Ibid.*

Harnphanich exited his police vehicle and approached the driver's side of the van, at which point he noticed Hinds holding a marijuana joint.  *See* Ex. F, Harnphanich Body Camera Part I, at 15:45-16:30.  He directed Hinds to place the marijuana on the dashboard and exit the vehicle toward Bush, who was by now standing on the passenger side of the van.  *Ibid.*  According to the officers, this request agitated Hinds, who began shuffling his feet, reaching his hands into his pockets, and telling them that he possessed a medical marijuana card.  Trial Tr. Vol. II, ECF No. 167, PageID.143; Ex. F at 16:10-25.  After the officers informed Hinds that using marijuana inside of a vehicle was unlawful, Ex. F at 16:10-25, Hinds stepped out of the car where he was frisked by Bush, Trial Tr. Vol. II, ECF No. 167, PageID.1430.  Meanwhile, Harnphanich asked the occupant of the driver's seat, another man, to exit the car.  *Ibid.*  The officers handcuffed the men

together and directed them to stand in front of the patrol car.  Ex. F at 17:00-25.  Harnphanich next asked the third occupant of the car, a young woman, to exit the vehicle and then proceeded to search it.  *Id.* at 17:45-18:00.  He soon discovered an open blue cloth bag on the floorboard of the passenger seat, where Hinds's feet had been.  Trial Tr. Vol. II, ECF No. 167, PageID.1434.  Peering inside the bag, he observed several smaller plastic bags containing substances he believed to be illegal narcotics.  *Ibid.*

"Beautiful, and a eureka," Harnphanich exclaimed as he brought the bag to the patrol car, using terms that referred to the drug find.  Ex. F at 18:30-45.  "This is a motherfucking jackpot." *Ibid.*  He set the blue cloth bag on the front hood and began emptying its contents, discovering a handgun, which he cleared; the plastic bags suspected to contain narcotics; two green plastic pill bottles (one of which contained a white label); and a digital scale.  *Id.* at 18:50-19:45.  Harnphanich returned to the van to resume his search and eventually found in the center console another digital scale and some plastic bags that he believed were used for packaging narcotics.  Trial Tr., Vol. II, ECF No. 167, PageID.1441-42.

Officer Richard Danescu soon showed up at the scene to provide backup.  *Id.* at PageID.1487.  On arriving, he assisted Bush with uncuffing Hinds from the other male occupant of the van so that he could be transferred to the back of the patrol car.  *Id.* at 1490.  Bush then told Danescu that he believed Hinds had money in his pockets because he had seen it earlier in their encounter.  *Id.* at PageID.1490-91.  Bush removed Hinds from the patrol car and began searching his body.  *Ibid.*  Unable to find any money in Hinds's jacket or pockets, Bush proceeded to search Hinds's undergarments over his repeated objections.  Ex. H, Officer Bush Body Camera Footage at 8:40-9:20.  Bush quickly recovered two wads of cash from beneath Hinds's genitals.  *Id.* at 9:20-30.  The officers would later determine that Hinds was carrying $2,109.  Trial Tr., Vol. II, ECF

- 3 -

No. 167, PageID.1444.  The officers permitted the two other individuals from the minivan to leave the scene but placed Hinds under arrest and transported him to the police precinct.

## B.  Proceedings

On November 30, 2017, Hinds was charged federally with possession with intent to distribute cocaine base (21 U.S.C. § 831(a)(1)), possession of a firearm as a felon (18 U.S.C. § 922(g)(1)), and possession of a firearm in furtherance of a drug trafficking crime (18 U.S.C. § 924(c)).  Hinds moved to suppress evidence from the vehicle, arguing that the officers lacked reasonable suspicion to conduct the stop or probable cause to search the vehicle.  Judge Roberts referred the motion to Magistrate Judge Mona Majzoub, who held an evidentiary hearing on February 6, 2019 during which Officers Harnphanich and Bush testified.  She issued a report recommending the Court grant the motion.  Although she determined that the officers had reasonable suspicion for the stop, she determined that the search, which had been justified on the suspicion of a marijuana offense, was not supported by probable cause because of Hinds's compliance with the Michigan Medical Marijuana Act.  The government objected, and Judge Roberts rejected Judge Majzoub's recommendation and denied the motion to suppress, holding that Hinds's compliance had no bearing on whether probable cause for the search existed under the Fourth Amendment.

Hinds then moved to suppress several statements he made to officers.  Judge Roberts denied the motion with respect to one statement made to officers during the interrogation at the police precinct but held an evidentiary hearing to determine whether Hinds was in custody when he made an incriminating statement at the scene.  The hearing did not take place until May 10, 2021.  Officers Harnphanich and Bush each testified.  After the hearing, Judge Roberts granted

Hinds's motion, holding that his statement, "It's all me, bro," should be suppressed because he was subjected to custodial interrogation at the scene without proper *Miranda* warnings.

The case proceeded to trial in March of 2022. Before trial, the government included Officer Bush on a witness list furnished to the defense. However, the AUSA later turned over a substitute witness list in which Bush was replaced by Officer Danescu. During the two-day trial, the jury heard testimony from Officer Harnphranich, Officer Danescu, Michigan State Police chemist Kelsey Longe, case agent Eric Smigielski, and ATF Agent Brady Rees. The government did not call Bush as a witness. The defense called no witnesses.

After deliberating for about an hour, the jury sent a note stating, "We were wondering . . . why Officer Bush didn't testify. Why did we hear from Officer Harnphanich, but not from the officer who performed the search and recovered the money? Is it reasonable for us to ask?" ECF No. 166. The Court held a conference with the attorneys; the defense asked for a missing witness instruction. The Court declined to give that instruction and instead responded: "The Government believes that the testimony of Officer Bush would have been cumulative. Having made that decision, it is for you to decide if the Government met its burden of proof." ECF No. 168, PageID.1689. The jury deliberated for approximately one more hour before finding Hinds guilty on all counts.

Although not charged as such in the indictment, Hinds was designated as an armed career criminal under 18 U.S.C. § 924(e). On September 15, 2022, Judge Roberts sentenced him to 240 months in prison, the statutory minimum due to the application of the Armed Career Criminal Act and the mandatory five-year consecutive sentence for his conviction under 18 U.S.C. § 924(c). Hinds filed a notice of appeal and filed a brief raising the denial of his motion to suppress evidence obtained from the vehicle, the district court's failure to permit the jury to decide whether at least

three of his previous convictions occurred on separate occasions, and the district court's decision to impose the enhanced statutory minimum under the Armed Career Criminal Act. On February 23, 2023, Hinds filed a motion for an indicative ruling under Federal Rule of Criminal Procedure 37, but Judge Roberts declined to rule on it due to her impending retirement. On October 4, 2023, Hinds renewed his request after the case was reassigned and concurrently filed a motion in the court of appeals to hold his appeal in abeyance due to the pendency of his motion for an indicative ruling in this Court. The court of appeals granted that request and directed Hinds to provide regular updates on this Court's action.

### C. Officer Bush

After Hinds's trial, his appellate counsel learned that Officer Bush had a history of discipline that had not been disclosed previously. Defense counsel heard about the discipline from a March 16, 2022 WXYZ news story. He obtained Bush's disciplinary records through defense attorney Lillian Diallo, who had received them for use in a separate case. The government did not disclose the information.

In his present motion, Hinds challenges the government's failure to disclose before trial that Officer Bush had been recommended for termination from the Detroit Police Department. The incident giving rise to that recommendation involved a high-speed pursuit gone wrong several years after Hinds was arrested.

According to the Detroit Police Department's investigative report, on the evening of January 3, 2020, Bush was on patrol in the passenger seat of a black semi-marked police vehicle driven by another officer. For reasons that remain unclear, the officers decided to stop a blue 2007 Saturn Aura and made a U-turn to follow the car, which had been traveling in the opposite direction. The Saturn accelerated away, so Bush's vehicle gave chase, reaching speeds of 65 miles

per hour.  Neither Bush nor the other officer activated the patrol car's emergency lights during the pursuit.  When an officer activates their car's emergency lights, the vehicle's dashcam automatically begins recording.  But unbeknownst to the officers, their dashcam was already recording.  Bush also was wearing a body camera, which he did not activate right away.  They did attempt to use the patrol vehicle's spotlight to illuminate the fleeing car.  Detroit police investigators believe that the officers' actions suggest that they intentionally sought to avoid engaging their vehicle's dashcam.

Eventually, the Saturn ran a light and collided with an SUV, killing the Saturn's passenger. Several aspects of the officers' response to the accident concerned police investigators.  First, they determined that Bush failed to activate his body camera promptly.  Second, they did not notify dispatch of their location or the circumstances.  Third, the investigators determined that Bush failed to provide complete and accurate information about the incident.  He told a responding officer that he and his partner were attempting to stop the Saturn, but it crashed almost immediately, before they could activate their emergency lights.  Bush also failed to report that a civilian was in their police vehicle for a ride-along.

The police department issued a Notice of Discipline on July 8, 2021, finding that Bush had violated six department policies and recommended that he be terminated.  Apparently, this was not the first time Bush had faced departmental discipline: on March 23, 2019, he was suspended for three days for failing to activate his body camera and on June 30, 2020, he received a written reprimand for deactivating his body camera prematurely while investigating a motorist who was arrested.  He also was suspended for three days in 2020 for using "coarse, profane language" towards an arrestee.

The termination recommendation occurred after Bush had testified at both evidentiary hearings in this case, but it was known to the government before the March 2022 trial. Hinds's appellate attorney represents that he contacted the government in December of 2022 to inquire whether it had produced information about Bush's discipline to trial counsel. In response, the government stated, "Regarding Officer Bush, he was not a government witness at trial, so nothing about the disciplinary proceeding was disclosed."

## II.  Discussion

In his present motion, Hinds asks the Court to issue an order indicating that it would grant him a new trial based on the government's failure to disclose information about Officer Bush's disciplinary history and pending termination from the Detroit Police Department. He maintains that Bush was a critical witness for the investigation and had heightened responsibilities as a custodian of evidence used in his case. By the time of trial, however, Bush had been recommended for termination due to his violations of DPD rules, some of which bear on his honesty. Hinds argues that the evidence of Bush's disciplinary record was material and that the government suppressed it, denying him due process under the rule in *Brady v. Maryland*, 373 U.S. 83 (1963). Had defense counsel known of these issues, they say, they might have litigated the case differently.

The government argues that Hinds has not shown that Bush's disciplinary history rises to the level of materiality necessary to find a *Brady* violation. It reasons that because Bush did not testify at trial, the jury did not rely on his account in reaching its verdict and instead relied on the testimony and body camera footage of Officer Harnphanich. Any testimony from Bush, it insists, would largely have duplicated the other evidence in the case.

- 8 -

A. Indicative Ruling

A notice of appeal generally transfers jurisdiction of a case from the district court to the circuit court. *Lewis v. Alexander*, 987 F.2d 392, 394 (6th Cir. 1993) ("As a general rule, the district court loses jurisdiction over an action once a party files a notice of appeal, and jurisdiction transfers to the appellate court.") (citing *Cochran v. Birkel*, 651 F.2d 1219, 1221 (6th Cir.1981)). However, Federal Rule of Criminal Procedure 37 permits a district court to state that it would reconsider its judgment if the case were remanded for that purpose. That rule states that, upon a timely motion, the Court may "state either that it would grant the motion if the court of appeals remands for that purpose or that the motion raises a substantial issue." Fed. R. Crim. P. 37(a)(3). Otherwise, the court may either defer ruling on the motion or deny it. *Ibid.* When it adopted the rule in 2012, the Federal Criminal Rules Committee anticipated that the rule would "primarily if not exclusively" be used for newly discovered evidence motions under Rule 33(b)(1), reduced sentence motions under Rule 35(b), and motions for compassionate release under 18 U.S.C. § 3582(c). Adv. Comm. Notes, Fed. R. Crim. P. 37 (2012). Hinds properly invokes this rule here.

B. *Brady* Elements

It is well settled that "prosecutors must generally turn over [to the defense] material evidence favorable to a defendant." *Stockdale v. Helper*, 979 F.3d 498, 504 (6th Cir. 2020) (citing *Brady v. Maryland*, 373 U.S. 83, 87 (1963)). That is because "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87. The rule applies to both exculpatory and impeachment evidence. *Giglio v. United States*, 405 U.S. 150, 154 (1972).

To establish a *Brady* violation, "[1] the evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; [2] that evidence must have been suppressed by the State, either willfully or inadvertently; and [3] prejudice must have ensued." *Jackson v. City of Cleveland*, 925 F.3d 793, 814 (6th Cir. 2019) (citing *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999)).  The "prejudice" component rounds out the concept of materiality, but it is defined in a particular way for evaluating the potential impact of withheld evidence.  *See Strickler*, 527 U.S. at 282 (explaining that the defendant's task is to "establish[] the prejudice necessary to satisfy the 'materiality' inquiry" for a *Brady* violation).  "Evidence qualifies as material when there is 'any reasonable likelihood' it could have 'affected the judgment of the jury.'" *Wearry v. Cain*, 577 U.S. 385, 392 (2016) (quoting *Giglio*, 405 U.S. at 154).  Importantly here, "withheld information is material under *Brady* only if it would have been admissible at trial or would have led directly to admissible evidence." *Gumm v. Mitchell*, 775 F.3d 345, 363 (6th Cir. 2014).

The Supreme Court has recognized that the "touchstone of materiality is a 'reasonable probability' of a different result." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995) (citing *United States v. Bagley*, 473 U.S. 667, 678 (1985)).  The Court explained that "[t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Ibid.*  To establish materiality, then, the defendant "need not show that he 'more likely than not' would have been acquitted had the new evidence been admitted." *Wearry*, 577 U.S. at 392 (quoting *Smith v. Cain*, 565 U.S. 73 (2012)).  "He must show only that the new evidence is sufficient to 'undermine confidence' in the verdict." *Ibid.*  "[The defendant] can

prevail even if the undisclosed information may not have affected the jury's verdict." *Id.* at 392 n.6.

The government concedes that it did not disclose Bush's disciplinary record prior to trial. However, it contends that the evidence would have been impeaching, and therefore favorable to Hinds, only had Bush been called to testify at trial. Because Bush did not testify, the government argues, its suppression of the Bush's disciplinary history did not amount to a *Brady* violation because that evidence was not favorable to Hinds and therefore not material.

Many courts that have addressed the question in this context have held that the government is not obligated to disclose unfavorable information about officers it does not call to testify. *See*, *e.g.*, *United States v. Johnson*, 519 F.3d 478, 489 (D.C. Cir. 2008) (holding that the government's failure to disclose impeachment evidence regarding an officer who did not testify at a suppression hearing did not amount to a *Brady* violation); *United States v. Brown*, 728 F. App'x 614, 618 (9th Cir. 2018); *United States v. Begay*, No. 21-cr-119, 2022 WL 1110195, at *4 (D. Minn. Jan. 6, 2022) (denying defendant's motion to compel production of *Giglio* material where the personnel investigation of the case agent was unrelated to the case); *United States v. Brown*, 19-CR-222, 2020 WL 2028538, at *6 (W.D.N.Y. Apr. 29, 2020) (holding that the government was not required to disclose personnel information about a special agent it represented would not testify at trial); *United States v. Brown*, No. 11-356, 2014 WL 92727, at *2-3 (M.D. Fla. Jan. 9, 2014) (finding no *Brady* violation when case agents were the subject of an undisclosed internal investigation but did not testify); *United States v. Ballesteros*, No. 11-20698, 2012 WL 3639059, at *3 (S.D. Fla. Aug. 24, 2012) (finding no *Brady* violation where the government did not disclose that an officer who did not testify was later charged with official misconduct and grand theft in another case); *Bastidas v. City of Los Angeles*, No. 04-8902, 2006 WL 4749706, at *7 (C.D. Cal. Feb. 22, 2006) (stating

- 11 -

that the government is only required to turn over personnel files of officers who testify).  In some circumstances, however, a disclosure obligation has been found.  *See United States v. Edwards*, No. 22-CR-69, 2023 WL 8605179, at *13 (N.D. Miss. Dec. 12, 2023) (holding that a defendant must have access to certain *Giglio* information to attack a non-testifying agent's credibility as lead investigator on the case); *United States v. Stevens*, No. 08-231, 2008 WL 8743218, at *9 (D.D.C. Dec. 19, 2008) ("To say that misconduct by law enforcement officers would not affect the integrity or result of a trial simply because the officers did not testify at trial is baseless; if that were the case, the government would be free to engage in rampant misconduct without risk or ramification, provided the prosecution took care not to call any of the violators as witnesses.").

There are limits on the government's trial strategy tactics designed to avoid disclosure of information that may harm its case.  Some are ethical.  *Kyles*, 514 U.S. at 437 (quoting ABA Model Rule of Professional Conduct 3.8(d) (1984) ("The prosecutor in a criminal case shall . . . make timely disclosure to the defense of all evidence or information known to the prosecutor that tends to negate the guilt of the accused or mitigates the offense")).  If the question is close, or if trial tactics may render exculpatory or impeaching evidence "material," "the prudent prosecutor will resolve doubtful questions in favor of disclosure." *United States v. Agurs*, 427 U.S. 97, 108 (1976), *holding modified by United States v. Bagley*, 473 U.S. 667 (1985).  As the Supreme Court has observed, "[t]his is as it should be." *Kyles*, 514 U.S. at 439.  But not here, apparently.

The limitation on the government's conduct that governs the present motion is the Due Process Clause, which, as discussed earlier, is triggered by the materiality of the withheld evidence.  The defendant argues that there are times when *Giglio* material must be disclosed even when the object of that impeaching information does not testify, as in this case.  To support that argument, he relies heavily on *United States v. Jackson*, 345 F.3d 59 (2d Cir. 2003).  In that case,

the Second Circuit explained that the fact that a confidential informant for the government did not testify at trial posed no barrier to the defendants' *Brady* claim, which related to several undisclosed documents that undermined the informant's reliability. *Jackson*, 345 F.3d at 67-68, 70.  However, the court's holding cannot be read as broadly as Hinds wishes.  While echoing Hinds's concern that the government should not be able to avoid disclosing unfavorable information "simply by not calling the relevant witness to testify," the court determined that "*Brady* and its progeny may require disclosure of exculpatory and/or impeachment materials whether those materials concern a testifying witness or a hearsay declarant." *Id.* at 71.  This passage, combined with the case's factual circumstances — the informant had passed away before trial — suggests that the Second Circuit was concerned primarily with information about non-testifying witnesses whose statements would still appear at trial via a hearsay exception. *Accord United States v. Percoco*, 16-CR-776, 2018 WL 9539131, *1 n.1, (S.D.N.Y. June 14, 2018) ("[T]he Government has an obligation to turn over *Giglio* material regarding hearsay declarants whose out of court statements will be admitted at trial, regardless of whether the hearsay declarant testifies.").

Basing Hinds's *Brady* claim on impeaching Bush as a hearsay declarant does not find much support in this record, however.  Hinds only points to one example of a statement by Bush that found its way into the trial and could be considered hearsay. *See* ECF No. 212, PageID.3186 ("Danescu testified that Bush told him that . . . the money had mysteriously disappeared . . . ."). The Court overruled the defendant's objection after the government argued that the statement was not being introduced for the truth of the matter asserted but to explain what Danescu did next. Trial Tr. Vol. II, ECF No. 167, PageID.1490-91.  But the presence or absence of the money, which later was discovered by Bush during his more intrusive search, was not a main point of the trial.

- 13 -

Even when impeaching information about a testifying witness is withheld, materiality is not always present. In *Kelley v. Burton*, No. 22-1135, 2023 WL 2755654 (6th Cir. April 3, 2023), the court of appeals held that the defendant's inability to obtain impeachment evidence about the state's detective was not material because he "provided primarily background information and corroboration" of the testimony of the state's key witness, a confidential informant. *Id.* at \*5.

Hinds correctly asserts that the Court must assess the collective effect of the withheld evidence when determining materiality. *Kyles*, 514 U.S. at 436 (holding that the "materiality . . . of suppressed evidence [is to be] considered collectively, not item by item"). In *Kyles*, the Supreme Court evaluated the impact of prior statements of a key witness, albeit a non-testifying one, on the credibility of certain eyewitnesses and held that the suppression of the evidence undermined confidence in the guilty verdict. Hinds then points to several aspects of the trial that he believes could have been affected by the disclosure of Christopher Bush's disciplinary record. None establishes materiality, however.

### 1. Money Evidence

Hinds maintains that the information about Officer Bush would have given him grounds to challenge the search of his underwear that turned up approximately $2,000. Although Bush's body camera footage captured the search, his camera was not activated during Bush's initial encounter with Hinds in the passenger seat of the car when he claims to have observed cash in Hinds's pockets. Hinds argues that without the footage, there was no corroborating evidence justifying the search of his underwear and that Bush's multiple previous failures to activate his body camera raise a level of suspicion about probable cause, which may have affected the admissibility of the money, as well as the admissibility of Officer Danescu's statement that Bush said that Hinds had money on his person.

It is not clear why Hinds believes the money would not have been inevitably discovered during a search incident to a lawful arrest. *See, e.g.*, *United States v. Mohammed*, 512 F. App'x 583, 589 (6th Cir. 2012) (holding that inevitable discovery exception applied to a body search where there was sufficient evidence to conclude that a defendant would have been arrested for possession of a stolen gun based on information discovered independently of the unlawful search). The record reflects that the officers had ample probable cause to arrest Hinds for a drug offense. That issue aside, the money was merely one part of a larger constellation of evidence implicating Hinds in the crimes. Therefore, even if the money and associated testimony were completely excluded from the trial, there would not be a reasonable probability of a different result. In addition to the money, the government furnished evidence directly connecting Hinds to drug distribution, including the digital scales, the handgun, the plastic bags, and the individually packaged bags of cocaine totaling 159 grams. Trial Tr., Vol. III, ECF No. 168, PageID.1604. Hinds likens the situation to *United States v. McClellon*, 260 F. Supp. 3d 880 (E.D. Mich. 2017), where the Court found a *Brady* violation when the evidence "could have destroyed the credibility of its strongest witness in the eyes of the jury." *McClellon*, 260 F. Supp. 3d at 887. That witness — an officer who had been suspended from his duties for making false charges of weapons offenses — was the only person present when the defendant allegedly disposed of the weapon that was the subject of the case. *Id.* at 885. What remained was a circumstantial chain of evidence linking the defendant to the gun. *Ibid.* Here, even if Hinds had the cash excluded, there is still substantial evidence the jury could have relied on to convict him on the drug charges had there been any reason to treat the money differently during trial. Officer Bush's disciplinary records cannot be considered material on this basis.

## 2. Weight and Amounts of Controlled Substances

Hinds maintains that Bush's disciplinary records undermine confidence in the verdict because of his role as an evidence custodian. He states that Bush's body camera was turned off during his inventory of the drugs at the police precinct. If he could have raised Bush's dishonesty during trial, he believes, the court may have ruled differently on his objection to the weight of the drugs and his request for a lesser included offense jury instruction for simple possession. That is unlikely.

To start, Hinds believes that the evidence about Bush may call into question the court's ruling on his objection to the quantity of drugs. As background, eight small bags containing a substance suspected to be cocaine were recovered from the scene. In her testimony, Kelsey Longe, the Michigan State Police forensic chemist, stated that she analyzed two bags and determined they contained cocaine. Trial Tr., Vol. III, ECF No. 167, PageID.1514-16. She then aggregated the weight of all the bags to calculate a total drug weight of 159.90 grams. *Id.* at PageID.1516. During trial, Hinds sought to exclude from consideration the substances that Longe did not test. Judge Roberts overruled the objection, citing a line of cases holding that drug quantity extrapolation is permissible when the government provides an adequate basis in fact and sufficient indicia of reliability. Trial Tr., Vol. III, ECF No. 168, PageID.1538 (citing *United States v. Price*, 761 F. App'x 568, 571 (6th Cir. 2019); *United States v. Jackson*, 470 F.3d 299, 310 (6th Cir. 2006)). However, the court permitted Hinds's counsel to argue about the weight jurors should give to the government's calculations during closing argument. *Ibid.*

It is unlikely that information about Officer Bush's disciplinary history, had it been presented somehow to the jury or the Court, would have altered Judge Roberts's ruling on this issue. There was an adequate basis in fact to allow extrapolation because eight similar bags of

cocaine were recovered from the crime scene, primarily as the result of a search conducted by Officer Harnphanich, as confirmed by his body camera footage. Trial Tr., Vol. III, ECF No. 167, PageID.1433-34. The lapse in Bush's body camera footage during his subsequent handling of the evidence at the precinct does not make it likely that he somehow tampered with the evidence. Notably, the Detroit Police Department body camera policy does not clearly require that a camera remain activated during an evidence inventory; it permits officers to turn off their cameras upon the completion of their interaction with a citizen in the performance of their duties. *See* DPD Draft Policy Directive — Body Worn Cameras, 304.6-3.1, ECF No. 212-7, PageID.3254. Bush appears to have ended his body camera recording prematurely here, failing to have his camera activated during the defendant's ride to the police precinct. But that does not mean he was required to record his interaction with the evidence in this case. Moreover, the substance of Bush's discipline involves charges of dishonesty and failing to provide complete information but not tampering with physical evidence.

Hinds could not have used the undisclosed evidence about Bush to undermine the cocaine evidence in a way sufficient to entitle him to relief under *Brady*. Although Bush's disciplinary history is indicative of a lack of candor and violations of department policy, it does not include any history of tampering with physical evidence. Certainly, Bush's conduct was blameworthy and beneath the standards of a sworn peace officer. But it is too great a stretch to suggest that Bush tampered with the evidence, particularly where, as here, another officer independently testified about the evidence and there is video evidence documenting each item before Bush encountered it.

Hinds also believes that the evidence about Bush could have caused the court to grant his request for a jury instruction on simple possession. This presents a slightly closer question. "A

- 17 -

defendant is entitled to a lesser-included offense instruction if '(1) a proper request is made; (2) the elements of the lesser offense are identical to part of the elements of the greater offense; (3) the evidence would support a conviction on the lesser offense; and (4) the proof on the element or elements differentiating the two crimes is sufficiently disputed so that a jury could consistently acquit on the greater offense and convict on the lesser.'" *United States v. LaPointe*, 690 F.3d 434, 439 (6th Cir. 2012) (quoting *United States v. Colon*, 268 F.3d 367, 373 (6th Cir. 2001)).  During trial, the parties only contested the fourth element.  Trial Tr. Vol. III, ECF No. 168, PageID.1599-1600.

Denying Hinds's request, Judge Roberts relied heavily on *Talley v. United States*, 573 F. App'x 410, 413 (6th Cir. 2014), in which the court of appeals held that the defendant was not entitled to a lesser included offense instruction for cocaine possession.  In that case, evidence was presented implicating the defendant in possessing "a set of digital scales, a loaded firearm, seven individually wrapped bags of cocaine base, additional small plastic bags, and $177 in cash." *Ibid.* The defendant testified and attempted to explain that the cocaine was for personal use and the scale was necessary to "weigh things up," but the court of appeals concluded that his explanation was not believable and that he therefore was not entitled to the instruction. *Id.* at 414.  In Hinds's case, Judge Roberts determined that the evidence of possession had not been disputed sufficiently because he put forth no evidence challenging the quantity of cocaine and no evidence that he personally used cocaine.  Trial Tr. Vol. III, ECF No. 168, PageID.1603.  She added that Hinds had not disputed the presence of separately packaged cocaine bags, the proximity of the gun, the digital scales, and the cash. *Id.* at PageID.1604.  The facts of Hinds's case are almost identical to *Talley*, where the court of appeals held that a lesser included offense instruction was not warranted. Although unlikely, had Hinds been able successfully to undermine the money and drug evidence

by impeaching Bush, he may have been better able to distinguish the case from *Talley*. But even then, there still would be no dispute about much of the other evidence that is indicative of distribution, such as the weapon, the additional bags in the car, and the digital scales. Hinds cannot show that evidence of Bush's discipline likely would have changed Judge Roberts's rulings.

### 3. Green Prescription Bottles

Hinds argues that Officer's Bush's disciplinary record could undermine the link between Hinds and the green "prescription" vials recovered from the bag discovered at Hinds's feet at the scene. During trial, Officer Harnphanich testified that one of the vials had a label stating "5.2 grams of Super Glue $20 cannabis" and a warning to "[u]se with caution." Trial Tr., Vol. II, ECF No. 167, PageID.1438. Officer Smigielski, who was not present at the scene but familiarized himself with the evidence later, testified similarly but stated that the label also included the defendant's name. Trial Tr., Vol. III, ECF No. 168, PageID.1541-44. This evidence linked Hinds to the bag containing the cocaine. Defense counsel objected to the government's questions to Smigielski about the vials on the ground that he was not present when they were recovered. *Id.* at PageID.1543. The Court asked the government to "move on," but permitted Smigielski to testify about the label containing Hinds's name. *Id.* at PageID.1544. The government then discussed the label repeatedly during its closing argument. *Id.* at PageID.1643, 1650. For his part, defense counsel pointed out in his closing that the fact that the label contained Hinds's name was not mentioned in the officers' police reports. *Id.* at PageID.1667. Had the information about Bush's disciplinary history been available, Hinds believes, he could have suggested to the jury that the vial and its label may have been compromised, further explaining the discrepancy with the police report.

Once again, Hinds's speculation goes too far.  Officer Harnphanich's body camera footage from the scene shows that one of the green vials had an affixed label, although its text is illegible. *See* Resp. at 22, ECF No. 214, PageID.3285.  Defense counsel's theory would require Officer Bush to have removed the label already attached to the vial, create a new one with Hinds's name, and reattach it to the vial.  This sequence of events is implausible.  First, it is not surprising that a marijuana container would have specified Hinds's name.  That is consistent with the argument he advanced in his first motion to suppress that he was a lawful medical marijuana user.  Second, it is not altogether surprising that the police report failed to state that the vial had Hinds's name, but even so, defense counsel took the opportunity to raise this issue with the jury.  Finally, as stated previously, Officer Bush's misconduct involved dishonesty, not evidence tampering.  Defense counsel's inability to argue such a speculative theory does not undermine confidence in the trial. *Cf. Hill v. Mitchell*, 842 F.3d 910, 933 (6th Cir. 2016) (stating that undisclosed evidence that may have some tendency to impeach a witness was not sufficient to undermine confidence in the jury's verdict when weighed against substantial evidence of guilt from other testifying witnesses).

### 4. Heroin

Hinds suggests that the government's decision not to use the heroin recovered from the scene, in light of Officer Bush's disciplinary record, could cast doubt on the reliability of the other drug evidence.  Hinds was not charged with any crimes related to heroin, and heroin was not mentioned during his trial.  It appears that this argument is an attempt to relitigate Judge Roberts's pretrial denial of the defense's motion to compel production of the heroin for inspection.  In her order, Judge Roberts determined that the heroin was not subject to inspection because it "would not be probative of whether he possessed or intended to distribute cocaine."  ECF No. 126, PageID.1042.  She also determined that Hinds could not make it relevant by calling an expert

witness to testify about it in an effort to challenge the credibility of the officers' testimony about the cocaine evidence because this strategy would run afoul of Evidence Rule 608.

Yet again, Hinds asks the Court to engage in multiple layers of speculation: first, that there was some issue with the heroin evidence at all; second, that the issue somehow affected the cocaine; and third, that Bush was involved. Hinds fails to articulate why the undisclosed information about Bush would make a legal difference to Judge Roberts's pretrial ruling on his motion to compel. Because evidence related to heroin was not introduced at trial, it is simple enough to conclude that Hinds's inability to impeach Bush on this issue does not undermine confidence in the jury's verdict.

### 5. Missing Witness Instruction

Next, Hinds points to the jury's inquiry about Officer Bush and argues that Judge Roberts may have given a missing witness instruction had she known about his disciplinary history. Recall that when the jury sent its note, the Court held a conference with the parties and discussed the possibility of providing a missing witness instruction but ultimately decided that it was not appropriate. Trial. Tr. Vol. III, ECF No. 168, PageID.1683-87. Contrary to Hinds's contention, that decision likely would have been the same had the court been aware of Bush's disciplinary history.

A missing witness instruction is appropriate where a witness is "peculiarly within the opposing party's power to produce" and her testimony would "elucidate the transaction." *United States v. Frost*, 914 F.2d 756, 765 (6th Cir. 1990) (quoting *United States v. Blakemore*, 489 F.2d 193, 195 (6th Cir. 1973)). To elucidate the transaction, the witness's evidence must not have been "merely cumulative." *United States v. Jones*, 940 F.2d 663, 1991 WL 150782, at \*5 (6th Cir. 1991) (table).

Hinds's argument faces two difficulties.  First, courts have recognized that police witnesses are generally within the defendant's power to subpoena and thus do not satisfy the requirements for the application of the rule.  *United States v. Sain*, 221 F.3d 1337, 2000 WL 921067, at *1 (6th Cir. 2000) (per curiam) (holding that a police officer who did not testify was equally available to the defense); *Kelly v. United States*, Nos. 11-CR-87, 15-CV-62, 2017 WL 3160608, at *5 (E.D. Tenn. July 25, 2017).  It is true that this case presents a unique circumstance because the defense lacked critical information about Bush that the government possessed and suppressed.  The availability of a witness requires an inquiry broader than the witness's physical availability.  *See Blakemore*, 489 F.2d at 195 ("'Availability' of a witness to a party must take into account both practical and physical considerations."); *Kelly*, 2017 WL 3160608, at *5 (declining to find error in counsel's decision not to request a missing witness instruction because he made no showing that a witness "had such a relationship with the government . . . that he was pragmatically unavailable").  "[P]racticality is the touchstone in this situation.  There may be a relationship of such description (legal, personal, practical or perhaps even social) between a prospective witness and one party that would in a pragmatic sense make his testimony unavailable to the opposing party regardless of physical availability."  *Blakemore*, 489 F.2d at 195 n.4.

But even under this standard, it is not clear that the government's suppression of Bush's pending discipline rendered him unavailable to the defendant as a witness.  The circumstances of his removal from the government's witness list, *see* ECF No. 212-6, PageID.3249; ECF No. 214-2, PageID.3290-91, could have caused defense counsel to inquire further and decide it should call him as a witness.

The Court need not decide this issue because Hinds runs into a second problem: Bush's testimony would not have elucidated any issues at trial because it would have been cumulative of

the evidence offered by other witnesses in the case.  As explained above, Bush's testimony would largely have covered the same ground as Officers Harnphanich and Danescu, who also were present at the scene, and there are no portions of Hinds's encounter with the arresting officers for which Bush's testimony would be critical.  Disclosure of Bush's disciplinary record would not have had an impact on the defense request for a missing witness instruction.

* * * * *

Officer Bush's disciplinary record was suppressed by the government.  But the effect that information might have had on the defense is mostly speculative, mainly because Bush did not testify as a witness at trial.  The government's suppression of this evidence does not undermine confidence in the verdict.

III.

The defendant's motion for an indicative ruling satisfies the requirements of Federal Rule of Criminal Procedure 37(a) in that it raises a substantial issue.  However, the evidence of Officer Christopher Bush's disciplinary history, which the government suppressed, is not material because there is no reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.

Accordingly, it is **ORDERED** that the defendant's motion for an indicative ruling (ECF No. 212) is **GRANTED**.

It is further **ORDERED** that the defendant's motion for a new trial would be **DENIED**.

s/David M. Lawson<br>DAVID M. LAWSON<br>United States District Judge

Dated:  August 13, 2024

- 23 -